UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                :

In re:                            :     Chapter 11
                                :

TAXOPARK, INC.                :
                                :     Case No. 16-_____
                  Debtor.[1]    :
                                :
---------------------------------------------------------X

FIRST DAY AFFIDAVIT OF EVGENY FREIDMAN
PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY
RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK       )
                           ) ss.:
COUNTY OF NEW YORK    )

Evgeny Freidman, being duly sworn, deposes and says:

1.    I am the president, sole director and sole shareholder of Taxopark, Inc., a corporation organized under the laws of the state of New York and the debtor in possession ("Taxopark" or the "Debtor" or the "Company") in the above-captioned chapter 11 case.

2.    In my capacity as president and sole shareholder of the Company, I am familiar with its day-to-day operations, business and financial affairs, and I have hands-on management responsibility with respect to those affairs.

3.    Except as indicated, all facts set forth in this Affidavit are based upon: (i) my personal knowledge; (ii) information supplied to me by others within the Management Company (defined herein) who have financial dealings and lease obligations with the Debtor, and professionals retained to provide advice for those affairs; (iii) my review of relevant documents as well as publicly available information cited herein; and (iv) my opinion based upon my

---

[1] The last four digits of the Debtor's Federal Tax Identification Number are 1039.

3567147

experience and knowledge with respect to the Debtor's operations and financial condition, and with respect to the industry.  I am authorized to submit this Affidavit on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.   Unless otherwise indicated, the financial information contained in this Affidavit is unaudited.

4.      I submit this affidavit (the "Affidavit") pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on December 23, 2016 (the "Petition Date").  I have reviewed the Debtor's petition, and it is true and accurate to the best of my knowledge, and the relief sought therein is essential to ensure the continued operation of the Debtor's business and the preservation of contractual arrangements and jobs, while the Debtor seeks to reorganize under chapter 11 of the Bankruptcy Code.

5.      Because this case is filed on an emergent basis to stave off a pending eviction, not all schedules and information required pursuant to Local Rule 1007-2 has been compiled.  As a result, the Debtor will file an amended Affidavit containing any of the required information that is not included herein.

6.      There is no other or prior bankruptcy case filed by or against the Debtor.  No committee of unsecured creditors was organized prior to the order for relief in the Debtor's Chapter 11 case.

7.      A copy of the board resolution authorizing the Chapter 11 filing is attached to the Petition and incorporated by reference herein.

3567147

## I.    The Debtor's Business

### A.    The Debtor's Business Operations

8.    The Debtor is the tenant under a lease or leases as the same have been amended and modified, as to those certain premises known as 49-13 Roosevelt Avenue, Queens County, New York (the "Lease" and the "Leasehold Premises").  The Leasehold Premises serve as the "For Hire Base" and "Livery Base Station" ("Base Station") as defined under Chapter 59 of the New York City Taxi and Limousine Commission ("TLC") regulations for some 400 medallioned cabs, including both cabs owned and operated by affiliates of to the Debtor, and cabs owned by unrelated third parties[2]. Included within this fleet of 400 cabs is New York City's largest fleet of handicapped accessible cabs/medallions which are dispatched directly from that location when a handicapped person calls the TLC's 311 number to request a cab.   Some thirty (30) full time employees—mechanics, dispatchers and clerical staff operate out of the Leasehold Premises serving the 400 medallioned cabs that are based at the Leasehold Premises, and licensed to operate out of the Leasehold Premises.

9.    Pursuant to those regulations, no taxicab or driver can remain in business or operate without a Base Station, and no taxicab can have more than one base station at any one time.  *See* TLC Regs at 59A-03(h) and 59A-04(h) and (i).

10.    As the result of a longstanding dispute between the co-tenants who own the Leasehold Premises, one of whom is your affiant's father and the other of whom is Jacob Fayenson, the Debtor is subject to a judgment of ejectment from the Supreme Court of the State of New York, County of Queens dated August 11, 2016, in that certain matter captioned *Jacob*

---

[2] Some of the medallioned cabs operated out of the Leasehold Premises are currently under the supervision of Gregory Messer, as Chapter 7 Trustee, operating pursuant to a Section 721 Order dated October 28, 2016 in that certain matter captioned *In re Hypnotic Taxi, LLC et al.,* Case No.: 15-43300.

*Fayenson v. TaxoPark, Inc., Woodside Management, Inc., John Does 1-20, and XYZ Corps. 1-20*,

Index No. 3934/2013 (the "Ejectment Judgment").

11.     The Debtor is prosecuting an appeal of the Ejectment Judgment, which is pending

in the Supreme Court of the State of New York, Appellate Division, Second Department, and

docketed therein as Docket No. 2016-10971.

12.     Notwithstanding the pendency of the appeal, on November 21, 2016, the New

York City Office of the Sheriff posted a "Five-Day Eviction Notice" that he would be proceeding

to eject the Debtor from the Leasehold Premises pursuant to the Ejectment Judgment. A copy of

the Five Day Eviction Notice is annexed hereto as Exhibit A. Although the Debtor obtained a

temporary stay of the notice, that stay was lifted on December 21, 2016 and the Debtor and its

subtenants are therefore once again subject to immediate ejectment, expected as early as

December 23, 2016.

13.     Although the Debtor is primarily a holding company, i.e., it holds the lease with

the landlord, an eviction of the Debtor would have the immediate effect of eliminating the ability

of some 400 taxicabs to operate and thereupon eliminate the livelihoods of more than 1,000

drivers who operate those cabs, not to mention the thirty (30) full time employees who go to

work each day at the Leasehold Premises. This is because, as set forth above, the regulations

prohibit taxicabs from operating without an approved and licensed "Base Station," which is

precisely what the Debtor operates.

14.     By virtue of this Chapter 11 filing, and by seeking to reorganize under Chapter 11,

the Debtor seeks to avoid that result.

**B.      History of the Industry and the Problems it Faces**

15.     During the Depression of the 1930's, thousands of drivers descended upon New

4

York City, in the hopes of earning a living picking up fares. It was said that at one point, New

York had as many as 30,000 cab drivers in a completely unregulated industry, resulting in traffic

congestion and unsavory practices. Public concern arose not only over the congestion, but over

the maintenance and mechanical integrity of the taxi vehicles as well as over the integrity of the

drivers. In 1937, Mayor La Guardia signed the Haas Act which introduced official taxi licenses

and the medallion system that remains in place today. The Haas Act resulted in the restriction of

cab licenses to some 11,787, a number which held firm over a period of nearly 60 years until

1996 when the TLC began auctioning off new licenses. As of March 14, 2014, in New York

City, there were some 13,605 taxicab medallion licenses in existence and 51,398 men and women

licensed to drive them. Importantly, 368 of these 13,605 licenses had been auctioned by the City

of New York in three separate auctions between November 2013 and March 2014 at prices

averaging $1,250,000 per medallion.

16.    The TLC regulations require that owners of taxicab medallions must comply with

the following rules, regulations and restrictions, to name a few:

a.    Cabs must be inspected every four months;

b.    Cabs must have a licensed and TLC approved "Base Station" in order to operate, which is essentially what this Debtor is and what it provides;

c.    Taxicabs must have certain equipment, including partitions, taximeters of a make and type acceptable to the TLC, and a credit card machine;

d.    Drivers must have special licenses, and submit to annual drug tests;

e.    Trip record information, including the location where each passenger is picked up, the total number of passengers, the location where each passenger is dropped off, the time each passenger is dropped off, the total trip mileage, the itemized metered fare for the trip, method of payment, the trip number, and other related information must be constantly made available to the TLC;

f.    50% of all fleets must be handicap accessible through a transitional process with respect to new vehicles placed into service;

g.    The TLC also prescribes other rules, regulations and restrictions regarding: licensing, operations (such as with respect to rates and tolls, EZ Pass requirements, etc.), leasing, record keeping, vehicle conditions, vehicle equipment, medallion

3567147

transfers, insurance, driving hours, rates, group rides, refusing passengers, solicitation of passengers, driver's programs, etc.).

    h.    All new taxis purchased after September 1, 2015 must now be the NYC "Taxi of Tomorrow," based on the Nissan NV200 small commercial van body type.

17.    Despite these and other restrictions, medallion owners paid up to $2,500,000 per medallion[3] to the City, and lenders provided financing, in some instances 100% financing to medallion holding companies for the purchase of these medallions.   Why?   Because the City provided a monopoly to the medallion owner.   In return for paying a very large sum of money for your license to operate a taxicab, and in return for agreeing to comply with all of the costly regulations and requirements described in paragraph 16, above, a person owning a medallion company (and its financier) knew that each owned taxicab would enjoy the status of being one of a maximum of 13,605 taxicabs on the road in a City of eight million residents.

### C.    Enter Uber

18.    In 2014, Uber entered the New York City taxicab market. Its CEO and co-founder, Travis Kalanick had stated: "we don't have to beg for forgiveness because we are legal….[I]f you ask for permission upfront for something that's already legal, you'll never get it.   There's no upside to them." October 30, 2014, Politico New York. A copy of the Politico article is annexed hereto as **Exhibit B**.  Similarly, Erin Simpson, a spokeswoman for Lyft, stated in July 2014 "We do not believe [New York City's] licensing and base station rules apply to the Lyft ridesharing model." *Id.*

19.    Sadly, the TLC, which had earned revenues of roughly $400 million in the Fall 2013/Winter 2014 medallion auctions, agreed.   Tens of thousands of Uber and Lyft drivers descended upon New York City (ironically reminiscent of the 1930's history described in

---

[3] The highest prices of $2,500,000 were for "handicap accessible" medallions, many of which are operated out of the Debtor's facility here, since the TLC was requiring that in order for a fleet to maintain its license to operate with the City, 50% of the fleet must become handicap accessible.

3567147

paragraph 14, above).  No need to pay $1,000,000 or more for a license when you can do it without permission; no need to have your drivers or your cars regularly put through rigorous testing; no need to file daily ride and revenue reports with the City, and no need to make sure that your cars are environmentally friendly or handicap accessible, and no need to have a base station, which is what the Debtor is in the business if operating here, or comply with the remaining myriad of TLC rules regulations.

20.    The result?  51,000 licensed cabbies who drive 13,600 medallion-licensed vehicles must now compete with tens of thousands of Uber, Lyft and other similar drivers.  Crain's New York Business reported on October 6, 2015 that there were "over 30,000 Uber-affiliated vehicles in New York City today."  A copy of the Crain's article is attached hereto as **Exhibit C**.  The TLC website itself reflects about 40,000 Uber and 10,000 Lyft vehicles on New York City Streets as of the most recently available data.  In other words, four times more Uber and Lyft vehicles alone than taxis.  As a result, taxicab ridership and revenues have dropped dramatically, by as much as 50%.

21.    As a result of all of the above, this is an industry in extremis, but an industry which, in the view of many, is valuable to the City of New York, provides hundreds of millions of safe rides per year to millions of passengers, cares about the environment and the handicapped and the integrity of its drivers (it is required by TLC regulation to care) and provides tens of thousands of jobs to New Yorkers, many of whom are first generation Americans.

22.    If the Debtor was to be ejected from its premises, more than 1,000 of those jobs would be lost in an instant.

3567147

## II.    Corporate Structure, Management and Debt Structure

### A.    Corporate Structure and Management

23.    I am the President, sole director, and 100% stockholder of the Debtor.  I do not, and will not during the Bankruptcy Case, receive any distributions, dividends, payroll, salary or direct compensation from the Debtor.  The Debtor does not have any other officers or employees; therefore, the Debtor will not have any post-petition payroll and/or distribution obligations, other than for payment of allowed administrative expenses of the estate (including, without limitation, allowed fees and costs of professionals retained in this case with Court approval, and United States Trustee fees).

24.    I am the person generally responsible for and familiar with the Debtor's day-today business operations, books and records, business affairs and general financial condition. The Debtor was incorporated on December 3, 2002 in New York County, and maintains an office at 25 East 86th St., Apt. 9F, New York, NY 10028.  A copy of the NYS Department of State, Division of Corporations Entity Information report is annexed hereto as **Exhibit D**.  The books and records of the Debtor are maintained there, in my custody.

25.    The Debtor does not have any publicly held shares, debentures, or other securities.

26.    The Debtor has a modest amount of tax obligations, currently unliquidated and subject to dispute.

### B.    Unsecured and Priority Claims

27.    The Debtor also has outstanding vendor claims as will be set forth in the Debtor's bankruptcy schedules, but to summarize, amounts owed to Jacob Fayenson under a disputed judgment, currently on appeal, legal fees, and related claims and potentially millions in contingent claims if the hundreds of cabs who use the Debtor's premises as their licensed base

3567147

station were suddenly unable to operate.

### III.    Plans for this Chapter 11 Case/ Reorganization Strategy

28.    The Debtor intends to recover its leasehold, which is property of the bankruptcy estate, and will pursue a reorganization that will be in the best interests of all creditors and stakeholders.

29.    On November 10, 2016 and December 5, 2016 respectively, the Debtor paid its November and December rent to one of the tenant-in-common owners of the landlord and has confirmed that the rent payment was shared with the other tenant-in-common.   A copy of the proof for these transactions is annexed hereto as **Exhibit E**.

### IV.    <u>Information Required by Local Rule 1007-2</u>

30.    Pursuant to Bankruptcy Rule 1007 and Local Rule 1007-2, this affidavit provides the following information:[4]

31.    Set forth in the attached **Exhibit F** is a list of the names and addresses and where available, telephone numbers, of the creditors holding the twenty largest unsecured claims against the Debtor, excluding insiders, and (where available) the name of the person familiar with the Debtor's account.   This list also includes the amount of each claim, and, if appropriate, an indication whether such claim is contingent unliquidated, disputed, or partially secured, subject to the Debtor's rights to dispute the validity of any claims.

32.    Set forth in the attached **Exhibit G** is a list of the number and classes of debt securities of the Debtor that is publicly held.   The Debtor does not have publicly held equity securities.

33.    Set forth in the attached **Exhibit H** is a list of the premises owned, leased, or held

---

[4] Local Rule 1007-2(3) requires disclosure of certain information regarding any committee organized prior to the order for relief in a chapter 11 case.  As no such committee was formed in this case, Local Rule 1007-2(3) is not applicable hereto.

3567147

under other arrangement from which the Debtor operates its business.

34.     Set forth in the attached **Exhibit I** is a list of the locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

35.     Set forth in the attached **Exhibit J** is a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property, where a judgment against the Debtor or a seizure of it property may be imminent.

36.     Set forth in the attached **Exhibit K** is a list of the names of the individuals who comprise the Debtor's existing senior management (including such management's affiliation with other non-debtor entities), their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

37.     Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of the enforceability of, or the validity of any claim, (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing.   The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

3567147

The foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
December 22, 2016

/s/ _____
Evgeny Freidman

SWORN TO before me
this __th day of _____, 2016

/s/ _____

Notary Public-State of New York
No. _____
Qualified in _____ County
My Commission Expires _____

DESIREE A. KOSILOVA
Notary Public - State of New York
No. 01KO6348705
Qualified in Dutchess County
My Commission Expires 10/3/2020

11

3567147

## EXHIBIT A
(Five-Day Eviction Notice)

See attached.

3567147



## NYC OFFICE OF THE SHERIFF
### LAW ENFORCEMENT BUREAU
### 30-10 STARR AVENUE
### LONG ISLAND CITY, NY 11101
### (718) 707-2170



SUPREME COURT
QUEENS COUNTY
STATE OF NEW YORK

--------------------------------------------------------------X

JACOB FAYENSON

                PLAINTIFF/PETITIONER/LANDLORD

VS.


TAXOPARK INC , WOODSIDE MANAGEMENT
INC, ET AL

            DEFENDANT/RESPONDENT/TENANT

--------------------------------------------------------------X

# FIVE-DAY EVICTION NOTICE

TO THE TENANT(S):  WOODSIDE MANAGEMENT INC

<u>PLEASE TAKE NOTICE</u> that a JUDGMENT has been made in the above proceeding awarding to PLAINTIFF/PETITIONER possession of the premises now occupied by you at **49-13 ROOSEVELT AVENUE QUEENS, NY 11377**  and that a JUDGEMENT, WARRANT/ORDER OF EVICTION has been issued commanding the Sheriff to remove you and your belongings and put PLAINTIFF/PETITIONER in to possession thereof. (SEE ATTACHED MANDATE)

Therefore, as provided by law the undersigned will execute such WARRANT/ORDER OF EVICTION and you will be evicted <u>any time after FIVE BUSINESS DAYS</u> from the time this notice is given.

Sheriff Case # 16045798                    <u>NOTICE DATE: 11/21/16</u>
Court Index/Docket  # 3934-2013

Deputy Sheriff **JUAN LORENZI**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

- - - - - - - - - - - - - - - - - X
                                  :
JACOB FAYENSON,                   :
                                  :
                    Plaintiff,    :   Index No.: 3934/2013
                                  :
          - against -             :   JUDGMENT
                                  :
TAXOPARK, INC., WOODSIDE          :
MANAGEMENT, INC., JOHN DOES 1-20, :
AND XYZ CORPS. 1-20,              :
                                  :
                    Defendants.   :
                                  :
- - - - - - - - - - - - - - - - - X

WHEREAS, Plaintiff JACOB FAYENSON filed the instant action on

March 1, 2013;

WHEREAS, Defendants TAXOPARK, INC., and WOODSIDE MANAGEMENT,

INC., filed an Answer on April 29, 2013;

WHEREAS, Plaintiff JACOB FAYENSON is and, at and before the

commencement of this action, was a tenant-in-common, in fee

simple, with Naum Freidman of that certain plot, piece or parcel

of land, with the building and improvements thereon erected,

situate, lying and being at Woodside, in the Borough and County

of Queens, City and State of New York, more particularly bounded

and described as follows:

> BEGINNING at the corner formed by the
> intersection of the northwesterly side of
> Roosevelt Avenue (66 feet wide) with the
> westerly side of 50th Street; running thence
> SOUTHWESTERLY along the northwesterly side of
> Roosevelt Avenue, 116.13 feet; thence
> NORTHERLY and parallel with the westerly side

of 50th Street, 113.3 7 feet; thence EASTERLY and at right angles to the westerly side of 50th Street, 100.01 feet to the said westerly side of 50th Street; and thence SOUTHERLY along the westerly side of 50th Street, 54.34 feet to the corner aforesaid, the point or place of BEGINNING.

said subject premises are also known as and by the street number 49-13 Roosevelt Avenue, Woodside, NY 11377 (the "Property");

WHEREAS, a bench trial was held on February 25, 2016, before the Honorable Phyllis Orlikoff Flug, Judicial Hearing Officer;

WHEREAS, the Court entered a Memorandum Decision on May 27, 2016 (the "Memorandum Decision");

WHEREAS, the Memorandum Decision found in favor of Plaintiff on his cause of action for ejectment, finding that Defendants excluded and ousted Plaintiff from the Property; and

WHEREAS, the Memorandum Decision ordered that a judgment be entered in the total amount of $465,820.15 against the Defendants, jointly and severally for fair use and occupancy and $88,068.19 for out-of-pocket property expenses paid by Plaintiff during Defendants' occupation of the Property.

NOW WHEREFORE, IT IS ORDERED AND ADJUGED that the plaintiff JACOB FAYENSON, residing at 9 Sound Road, Northport, New York, does recover of the Defendants TAXPOARK, INC. and WOODSIDE MANEGEMENT, INC., with their last known place of business located at 49-13 Roosevelt Avenue, Woodside, New York, jointly

2

and severally, the amount of $465,820.15, being the amount owed for use and occupancy, together with $73,366.66. being pre-judgment interest at 9%, calculated from August 1, 2014, being a reasonable intermediate date, together with $88,068.19, being out-of-pocket property expenses paid by the Plaintiff, together with $13,870.73 being pre-judgment interest at 9%, calculated from August 1, 2014, being a reasonable intermediate date, plus $1,030.00, being costs and disbursements incurred herein, for the total amount of $642,155.73, and that Plaintiff shall have execution thereon; and it is further

ORDERED AND ADJUDGED that Plaintiff have immediate possession of the Property and Defendants immediately vacate the Property; and it is further

ORDERED AND ADJUDGED that Plaintiff may engage city marshals or city sheriffs to remove the Defendants and obtain the use of the Property.

ENTER:

Judgment entered this  11  day of  August , 2016.

Clerk

ENTERED
11:46 AM/PM
AUG 25 2016
COUNTY CLERK
COUNTY OF QUEENS

FILED & RECORDED
AUG 25 2016
COUNTY CLERK
QUEENS COUNTY

DOCKETED
BY

**EXHIBIT B**

(A copy of the October 30, 2014 Politico article)

See attached.

3567147

# POLITICO

## POLITICO NEW YORK

+



Taxis line up at LaGuardia. | AP Photo/Mark Lennihan

## Uber, Lyft, and the end of taxi history

By **DANA RUBINSTEIN** | 10/30/14 05:27 AM EDT

Uber, Lyft and like-minded taxi app companies are so innovative, and so fundamentally different than the livery entities that came before, that the long history of for-hire vehicles and the regulations created to govern them are now academic.

Or such is the case being made by, and for, these champions of the new sharing economy.

Uber C.E.O. and co-founder Travis Kalanick has long argued that his company doesn't need government officials to regulate it because it's a technology platform, not a transportation provider, and it self-regulates itself through customer feedback.

"We don't have to beg for forgiveness because we are legal," he told the Journal last year.
"But there's been so much corruption and so much cronyism in the taxi industry and so
much regulatory capture that if you ask for permission upfront for something that's already
legal, you'll never get it. There's no upside to them."

(On Wednesday, Uber moderated its position, but only slightly.)

Erin Simpson, a spokeswoman for Uber's rival Lyft, told Capital as it was preparing to
launch in the New York City market in July, "We do not believe [New York City's] licensing
and base station rules apply to the Lyft ridesharing model."

She has a point. The law was developed before they existed.

ADVERTISING



inRead invented by Teads

The New York City taxi industry is in fact as old as the combustion engine itself, or, if you
include the taxis' horse-drawn predecessors, far older. And the system of regulation that
has evolved along with it isn't pretty, and locks into place a de facto power structure that is
sometimes better at protecting the interests of the industry than of riders and working
drivers. It is, in this respect, a system that is ripe for the sort of disruption the app
companies like to talk about.

But taxi historians (yes, there are taxi historians) interviewed by Capital suggest that the
newcomers' post-regulation arguments ignore the reasons that cities created taxi

regulations in the first place.



"Customers don't quite grasp what it would mean to have a regulation-free taxi system—how dangerous it could be, how difficult it could be to control pricing once Uber really did gain a monopoly," said Graham Hodges, a Colgate University history professor and the author of Taxi!: A Social History of the New York City Cabdriver.

He added, "You'll have a lot more accidents, a lot more speeding. And fares would be very chaotic, like they were in the 20s. There are just some historical realities."

Another taxi history, which deals with the decades during which drivers of combustion engine taxis pushed horse-drawn hansom cabs off the streets of New York City, suggests that those progenitors of what was a new business model were as innovative as Uber and Lyft now purport to be, and then some.

According to that book, Gorman Gilbert and Robert Samuels' The Taxicab: An Urban Transportation Survivor, the early motor-taxi operators pioneered traffic signals and telephone networks to facilitate faster driving and dispatching.

John Hertz, a Czech-born car salesman and namesake of the ubiquitous rental-car company, turned second-hand cars into taxis and ended up developing the nation's largest fleet.

"After reading a University of Chicago study that found yellow (with a slight tint of red) to be the most visible color at the greatest distances, he painted his taxis yellow," write Gilbert and Samuels.

(One of the early stop signs was yellow, too.)

Hertz instituted profit-sharing with workers, and kept a doctor, dentist and nurse on staff to service them. He reduced prices, making taxis affordable to the middle class. And he promised to respond to service calls within ten minutes.

Aside from the occasional taxi war, the taxi industry remained relatively calm in the 1920s, and "public regulation of the industry was minimal," write Gilbert and Samuels.

But oversupply soon became a problem, one that the the Great Depression only exacerbated, with throngs of unemployed and underemployed men pouring into the taxi trade to battle for an ever-diminishing share of riders with disposable income.

Before the depression, there were 84,000 taxi drivers in the United States. By 1932 that number had gone up to 150,000, leading to cheap fares, and scenes of chaos on many city streets.

Baruch College entrepreneurship professor Edward Rogoff, in an article for a journal published by The New School, tells of an "oversupply" of taxis in New York City in particular, starting as early as the 1920s. He writes that by 1931, there were 21,000 New York City taxis, compared to 15,000 in 1923, by which time the Times, for example, was already blaming Midtown congestion on taxi oversupply.

Gilbert and Samuels attribute the rapid proliferation in part to the actions of auto manufacturers, who foisted their unsellable cars onto taxi companies, who in turn leased them to drivers desperate for work.

"A manufacturer would 'sell' cars to a taxi operator on favorable financing terms with low down payments," they write. "The cut-rate taxi operator would then lease the cars as taxi to drivers for three to four dollars per day. The drivers had to recoup these lease fees by hustling business legitimately or by some illegitimate means.

"Rate wars flared in cities throughout the country. Rates, which had ranged between forty cents and seventy cents for the first mile, were cut by the new cab operators to fifteen cents and later to ten cents. In some cities, such as Washington, the cut-rate taxis actually were free, and many cities had 'nickel' cabs, which charged five cents for any trip in the city."

Soon, newspapers began demanding more government control.

On September 22, 1932, the Cincinnati Enquirer wrote: "Taxicabs are a public service and should be regulated as such."

The New York Times declared, "The industry cries aloud for regulation."

In 1932, New York City mayor Jimmy Walker responded to the public demand for regulation with a new regulatory scheme, one that rapidly fell apart, in the later accounting of the Seabury Commission, after he took bribes from a taxi company.

New York City's next serious dalliance with taxi regulation bore fruit in 1937 with the passage of the Haas Act, which limited the number of taxi medallions to 13,500.

"Soon taxicab regulation was commonplace," write Samuels and Gilbert.

Cities instituted strict licensure requirements, they regulated fares, insurance coverage, vehicle quality. Increasingly, taxi service was seen as something akin to a public utility.

Over time, the new fleets stabilized, and calcified. By the 21st century, they had developed a reputation for mistreating their workers. They co-opted politicians and stymied innovation

with a litigiousness rivaled only by the personal injury bar.

Then, in recent years, came two big changes. One was the introduction of an outer-borough taxi scheme by Michael Bloomberg, which is almost as tightly regulated as the transitional yellow-taxi business, and is in the process of becoming reality (over the rhetorical and legal objections of the old medallion and some livery-fleet owners).

The other was the arrival of the taxi apps, promising a better future governed by free-market innovation.

"In some ways [the taxi apps] have the perfect prey, because medallion owners are notoriously bad," said Hodges. "The brokers or the fleets, those are not lovely people at all. But I don't see Uber acting as a salvation, and in fact I think they could make matters a lot worse."

Or not. Like everything in the taxi world, its history, and the implications of that history for the contemporary taxi set-up, are hotly contested.

Rogoff, an outspoken medallion-system critic, calls Gorman, who ultimately became a taxi commissioner, "an apologist for the medallion system." (Gorman could not be reached for comment.)

Rogoff agrees that some regulation is needed, particularly to ensure vehicle and driver quality. But by his account, the taxi battles of the 1930s are overemphasized by the other historians, and serve today as rationalizations for a corrupt medallion system.



New York City taxis, 1924. (AP Photo)

At the same time, he says, history has undermined the rationale for the Haas Act that limited medallion numbers in the first place, since after the act was passed, supply of taxis fell below the artificially inflated levels on its own.

"Markets correct for supply and demand," said Rogoff.

Or perhaps, as another taxi historian asserts, the innovation-regulation cycle is unavoidable. That's the argument of Bruce Schaller, a former city transportation deputy commissioner who has written extensively on the issue.

(Rogoff dismissed Schaller as just another guy "on the taxi industry payroll." Schaller responded, "Pay no attention. He is just making stuff up.)

"It's always been contested territory when you have newcomers providing taxi-like service," said Schaller. "So they need to be accountable. And at first they don't really see the need."

To illustrate that historical arc, Schaller pointed to the 1960s and 1970s, and the advent of the gypsy cab.

"It was a long, two-decade process to get the gypsy cabs into the system as for hire vehicles that have a very important and well-regulated place in the transportation universe," he said.

In a study published in 2007 in a journal called Transport Policy, Schaller concluded, "Without entry controls, the cab stand and street hail market experiences an oversupply of cabs, leading to deterioration of vehicle and driver quality. Applied to the dispatch market, however, entry restrictions often lead to deficiencies in taxicab availability."

Sam Schwartz, the noted traffic engineer and former New York City traffic commissioner, saw the advent of the so-called gypsy cab first-hand, back when he drove a yellow cab, and street riots prompted some taxi drivers to avoid neighborhoods in the Brooklyn and Bronx.

"That gave birth to the livery movement," he said, referring to the growth of the illegal-cab trade in the outer boroughs, offering New Yorkers unregulated taxi service in places where yellow cabs were unwilling to go.

"So the liveries started to accept hails and some of the yellows resented that," he said, adding that "they would burn each other's vehicles, and there was some violence that went on for a few years."

"Soon, the yellows would no longer drive people of color," he said.

Ultimately, it was agreed that the yellows would offer street hails and the liveries would concentrate on the boroughs, and the liveries were brought into the regulatory fold.

"Today's war, while not violent as the '60's battles were, has the potential to upset the industry as we have known it," said Schwartz, in an email. " Here's what yellows face today: UBER, UBERX, LYFT, GETT, VIA, Carsco.com, Bridj, LEAP, Black Line and more every day (not to mention the "greens"). Can this lead to deregulation? Yes.... Ultimately we are heading down a slippery slope to gridlock as virtually everyone can rent out a seat in his/her car at anytime ala Moscow which has about the worst traffic I've witnessed first-hand."

"I do predict that there will be a lot of problems," said Hodges. "And after [Uber] made tons more money, then we'll be back to regulation again."

*This article appeared in the November edition of* Capital *magazine.*

**EXHIBIT C**

(Copy of the Crain article dated October 6, 2015)

See attached.

3567147

** Will print automatically! If it doesn't, click **here**. **



# CRAIN'S
## NEW YORK BUSINESS

# Uber doubles number of drivers—just as de Blasio feared

More than 20,000 UberX drivers are roaming the streets of New York City, twice the number from September 2014. The mayor is scrutinizing their impact.

Andrew J. Hawkins



*Buck Ennis*
Uber is spreading across New York City.

York City today.

**Published:** October 6, 2015 - 1:34 pm

The Uber wave that prompted Mayor Bill de Blasio to try to cap the ride-share company's growth appears to be gaining strength: The number of Uber drivers in New York City has almost doubled in the past year, and fare revenue per driver also has increased, according to the company.

Last September, 10,000 UberX drivers, which operate as black cars, were roaming the streets of New York City. By March 2015, about 13,000 car-service drivers were using Uber's app to arrange rides with passengers. By September, that number had grown to 20,000, as well as another 4,000 yellow- and green-cab drivers who can be hailed through Uber. Taken together with the company's limo, SUV and carpool services, there are now over 30,000 Uber-affiliated vehicles in New

According to a blog post that went up on Uber's website Tuesday, average UberX (non-taxi) gross fares per hour increased by 6.3% from September 2014 to September 2015. Last month, UberX drivers earned $39.30 per hour in fares on average, up from $36.96 last year. That figure is inflated by part-time Uber drivers who make themselves available when the company's surge pricing is in effect.

The San Francisco-based company says about 42% of its drivers are part-timers, logging into the service 15 hours a week or less. Also Uber drivers who frequently cancel rides, or whose customer ratings drop below 4.5 stars, can find themselves locked out of the system.

Uber says its drivers are spending less time cruising or waiting for customers to summon a ride, and more time with passengers in their vehicles. In September 2012, the first year Uber was active in New York, drivers spent 16 minutes per hour with passengers. That number has risen to 32 minutes in 2015.

Uber says it has grown the pie, meaning it has attracted riders who did not previously use car service as much, but its gains in market share have certainly put pressure on yellow cabs, livery cabs and black-car businesses. Credit unions that finance taxi-medallion purchases tried to force the city to stop Uber drivers from responding to smartphone hails, but a judge dismissed the lenders' lawsuit.

Which is not to say the city hasn't tried to stymie Uber in other ways. In June, Mr. de Blasio unveiled a plan to cap Uber's growth at 1% while his administration studied its impact on traffic congestion. Uber unleashed an ad campaign and an army of lobbyists, forcing the mayor to retreat. The administration is now conducting a four-month traffic study, with data that Uber agreed to provide, after which it will likely propose a new plan to limit the company's growth, restarting the fight.

The concept of Uber's rapid growth conforms to numbers the city used to justify its plan. More than 25,000 new for-hire vehicle licenses have been issued since 2011, increasing by 63% a market that includes livery cabs and black cars, according to data released by the Taxi and Limousine Commission during the summer. Much of that growth has occurred in the past year: At least 2,000 licenses were handed out in each month of fiscal 2015, which ended June 30.

*Correction: Uber's algorithm does not prioritize drivers who log on to the service more frequently. That fact was misstated in a previous version of this article published online Oct. 6, 2015.*



Entire contents ©2016 Crain Communications Inc.

**EXHIBIT D**
(Taxopark Inc. Corporate Filing)

See attached.

3567147

**1602 0000** *559*

New York State Department of State
Division of Corporations, State Records and Uniform Commercial Code
One Commerce Plaza, 99 Washington Avenue
Albany, NY 12231
www.dos.ny.gov

# CERTIFICATE OF CHANGE
# OF

**TAXOPARK INC.**

*(Insert Name of Domestic Corporation)*

Under Section 805-A of the Business Corporation Law

FIRST: The name of the corporation is:

TAXOPARK INC.

If the name of the corporation has been changed, the name under which it was formed is:

SECOND: The certificate of incorporation was filed by the Department of State on:

DECEMBER 03, 2002

THIRD: The change(s) effected hereby are: *(Check appropriate statement(s))*

☐ The county location, within this state, in which the office of the corporation is located, is changed to:

☒ The address to which the Secretary of State shall forward copies of process accepted on behalf of the corporation is changed to read in its entirety as follows:
25 E. 86TH STREET
APT 9F
NEW YORK, NY 10028

☐ The corporation hereby: *(Check one)*
   ☐ Designates

   as its registered agent upon whom process against the corporation may be served.
   The street address of the registered agent is:

   ☐ Changes the designation of its registered agent to:

   The street address of the registered agent is:

DOS-1556-f-l (Rev. 06/12)                                                            Page 1 of 2

☐ Changes the address of its registered agent to:

_____

☐ Revokes the authority of its registered agent.

FOURTH: The change was authorized by the board of directors.

EVGENY A. FREIDMAN
*(Signature)*
*(Name of Signer)*

PRESIDENT - CEO
*(Title of Signer)*

## CERTIFICATE OF CHANGE

### OF

TAXOPARK INC.
*(Insert Name of Domestic Corporation)*

Under Section 805-A of the Business Corporation Law

Filer's Name  EVGENY A FREIDMAN

Address  25 E. 86TH STREET, APT 9F

City, State and Zip Code  NEW YORK, NY 10028

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED  FEB 10 2016

NOTE: This form was prepared by the New York State Department of State. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores. The Department of State recommends that all documents be prepared under the guidance of an attorney. The certificate must be submitted with a $30 filing fee.

*For Office Use Only*

DOS-1556-f-l (Rev. 06/12)

Page 2 of 2

**EXHIBIT E**
(Proof of Payment of November and December Rent)


See attached.

3567147

**TAXOPARK GARAGE INC.**
4913 ROOSEVELT AVE.
WOODSIDE, NY 11377

POPULAR COMMUNITY BANK
1-881/260

1507

11/10/16

PAY TO THE
ORDER OF __Naum Freidman__   $30,000

_temp attend_

DOLLARS

MEMO   49-13 Roosevelt
2 month Deposit

⑆001507⑆ ⑆026008811⑆ 0210003950⑆

---

**TAXOPARK GARAGE INC.**
4913 ROOSEVELT AVE.
WOODSIDE, NY 11377

POPULAR COMMUNITY BANK
1-881/260

1506

11/10/16

PAY TO THE
ORDER OF __Naum Freidman__   $15,000

DOLLARS

MEMO   49-13 Roosevelt
Nov/16 Rent

⑆001506⑆ ⑆026008811⑆ 0210003950⑆

---

**NAUM FREIDMAN**
**ELIZAVETA FREIDMAN**
25 E. 86TH ST., APT. 9F
NEW YORK, NY 10028-0553

1-2
210

7025

DATE 11/10/16

PAY TO THE
ORDER OF __Fayerson Jacob__   $7,500

_Seven thousand five hundred_   DOLLARS

**CHASE ◯**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO   49-13 Roosevelt ave.   (Rent November 2016)   Naum Freidman

⑆021000021⑆ 810104158⑆7025



**TAXOPARK GARAGE INC.**
4913 ROOSEVELT AVE.
WOODSIDE, NY 11377

POPULAR COMMUNITY BANK
1-881/260

1509

12/5/2016

PAY TO THE
ORDER OF___ Naum Freidman

$ **15,000.00

Fifteen Thousand and 00/100***************************************************************** DOLLARS

Naum Freidman

MEMO

Dec Rent 49-13 Roosevelt
2016

⑆001509⑆ ⑈026008811⑈ 0210003950⑆

---

**NAUM FREIDMAN
ELIZAVETA FREIDMAN**
25 E. 86TH ST., APT. 9F
NEW YORK, NY 10028-0553

1-2
210
81

7034

DATE '2/5/16

PAY TO THE
ORDER OF_ Jacob Fayerson      $ 7,500 00/100

Seven thousand five hundred     DOLLARS

**CHASE** ◆
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  "Grom"  Rent December      Naum Freidman

⑈021000021⑈ 810104158⑆ 7034

**EXHIBIT F**
(20 Largest Unsecured Creditors)

See attached.

17

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Taxopark Inc.** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|
| | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| **Adam Swanson, Esq. Adam Leitman Bailey, P.C. 120 Broadway, 17th Floor New York, NY 10271** | | **Unpaid legal fees** | | | | **$57,000.00** |
| **Jacob Fayenson c/o Val Mandel, P.C. 80 Wall Street, Suite 1115 New York, NY 10005** | | **Judgment** | **Disputed** | | | **$642,155.73** |
| **Taxi Club Management, Inc. 25 E 86th St., Apt 9F New York, NY 10028** | | **Prepetition Loan** | | | | **$75,000.00** |
| **Tenenbaum Berger & Shivers LLP 26 Court Street - Penthouse Brooklyn, NY 11242** | | **Notice Only** | | | | **$0.00** |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

## EXHIBIT G
(Publicly Held Debt & Equity Securities)

None.

**EXHIBIT H**
(Real Property)


None.

3567147

## EXHIBIT I
(Address of Books and Records; International Assets)

The Debtor's books and records are located at 25 East 86th St., Apt. 9F, New York, NY 10028.

The Debtor has no assets held outside the territorial limits of the United States.

3567147

**EXHIBIT J**

(Pending Actions With Imminent Judgments)

Judgment entered in the Supreme Court of the State of New York, County of Queens dated August 11, 2016, in that certain matter captioned *Jacob Fayenson v. TaxoPark, Inc., Woodside Management, Inc., John Does 1-20, and XYZ Corps. 1-20*, Index No. 3934/2013.

3567147

## EXHIBIT K
(Senior Management)

Evgeny Freidman is the sole officer and director of the Debtor.

3567147